Argued and submitted May 31, affirmed November 7, 2007

PORTLAND DEVELOPMENT COMMISSION,
*Petitioner,*

*v.*

STATE OF OREGON,
by and through
BUREAU OF LABOR AND INDUSTRIES,
*Respondent.*

Dan GARDNER,
in his capacity as Commissioner of the
Bureau of Labor and Industries,
*Third-Party Petitioner-Appellant,*

*v.*

PRECISION CONSTRUCTION COMPANY;
Aggressive Property Management, Inc.,
dba Northwest Infrastructure;
Da Neal Construction, Inc.;
Matrix Industries, Inc.;
Concrete Sawing Co.;
Reliable Fence & Construction, Inc.;
Brian B. Park,
dba Green Art Landscape & Irrigation;
Ken Parker Mason Contractor, Inc.;
Gary C. Hammack,
dba Hammack Pacific Construction;
Metro Interiors, Inc.;
Reichle Incorporated;
R & B Innovations in Wood, Inc.;
Building Materials Specialties;
Don's A-1 Glass, LLC;
Floor Solutions, LLC;
Rayborn's Plumbing, Inc.;
HVAC Incorporated;
Addison Global Interiors, Inc.;
and Portland Development Commission,
*Third-Party Respondents-Respondents,*

*and*

HAL'S CONSTRUCTION, INC.;
McDonald & Wetle, Inc.;
EC Company;
KSB Lock & Installation, Inc.,
and I.I.S, Inc.,
*Third-Party Respondents.*

Multnomah County Circuit Court
050505065; A132754

171 P3d 1012

Richard D. Wasserman, Attorney-in-Charge, Civil/ Administrative Appeals Unit, argued the cause for appellant. With him on the briefs were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

William F. Gary argued the cause for respondent Portland Development Commission. With him on the brief were Jillian R. Bruce, C. Robert Steringer, and Harrang Long Gary Rudnick P.C.

No appearance for respondent Precision Construction Company.

No appearance for respondents Da Neal Construction, Inc., and Concrete Sawing Co.

No appearance for respondent Rayborn's Plumbing, Inc.

No appearance for respondent Addison Global Interiors, Inc.

No appearance for respondents Aggressive Property Management, Inc., dba Northwest Infrastructure; Matrix Industries, Inc.; Reliable Fence & Construction, Inc.; Brian B. Park, dba Green Art Landscape & Irrigation; Ken Parker Mason Contractor, Inc.; Gary C. Hammack, dba Hammack Pacific Construction; Metro Interiors, Inc.; Reichle Incorporated; R & B Innovations in Wood, Inc.; Building Materials Specialties; Don's A-1 Glass, LLC; Floor Solutions, LLC; and HVAC Incorporated.

Before Haselton, Presiding Judge, and Edmonds and Armstrong, Judges.

HASELTON, P. J.

## HASELTON, P. J.

In this action involving enforcement of Oregon's Prevailing Wage Rate Law, *former* ORS 279.348 - 279.380 (2001), *renumbered as* ORS 279C.800 - 279C.870 (2003),[1] Dan Gardner, in his capacity as Commissioner of the Bureau of Labor and Industries (BOLI), appeals, assigning error to the allowance of summary judgment in favor of the Portland Development Commission (PDC) and to the denial of Gardner's own cross-motion for summary judgment. The trial court concluded, *inter alia*, that PDC had not "contracted for" the Tin Roof construction project in Portland and, thus, that project was not a "public work" within the meaning of *former* ORS 279.348(3); consequently, the prevailing wage payment requirements of *former* ORS 279.350 did not apply to that project. We agree with the trial court's determination in that regard and, accordingly, affirm.

The material facts for purposes of our analysis and disposition are uncontroverted. PDC is Portland's urban renewal and development agency, established pursuant to ORS 457.035, which encourages and coordinates projects throughout the city. The property involved in this case, known as the Tin Roof property, is located within one of PDC's urban renewal areas. PDC's stated goal for the area is to "improve the condition and appearance of the [urban renewal area], eliminate blight and blighting influences, to expand and improve public facilities and to stimulate private investment and economic growth in the [urban renewal area]." To promote those goals, in May 2000, PDC purchased the Tin Roof property, a dilapidated site, for $1,715,600. PDC then, through a real estate firm, marketed the property to third parties to purchase and redevelop the site in a manner compatible with PDC's urban renewal objectives.

In December 2003, after protracted negotiations, PDC agreed to sell the Tin Roof property to National Meeting Company, Inc. (NMC), a local business that would relocate its

---

[1] The Prevailing Wage Rate Law was substantially recodified in 2003 at ORS 279C.800 to 279C.870. Or Laws 2003, ch 79, §§ 165-76. Because those amendments apply only to public contracts first advertised for bid or entered into after March 1, 2005, Or Laws 2003, ch 794, §§ 336, 337, and the operative transactions in this case occurred before that date, this opinion refers to the antecedent statutes.

headquarters to the site. The ultimate purchase price was $1,210,000. In January 2004, NMC's principals, Douglas Daggett and Patrick Eckford, formed a separate limited liability company, Tin Roof Enterprises, LLC (the developer), to purchase and develop the land and then lease it back to NMC.

In June 2004, PDC entered into a "disposition and development agreement" (DDA) with the developer for the sale of the Tin Roof property. Under the DDA, PDC agreed to lend the developer $1,160,000 towards the purchase price. The DDA also bound the developer to comply with the general goals and objectives of the redevelopment area and, further, gave PDC the authority to review and approve significant changes in the developer's design development drawings, but only to the extent that elements in those drawings did not conform to the developer's initial conceptual plan.

In November 2004, without any involvement or participation by PDC, the developer entered into a contract with Precision Construction Company (the contractor) to undertake the construction project. The developer and the contractor, again without any involvement by PDC, selected and entered into agreements with all subcontractors for the construction. Work on the Tin Roof construction project began in January 2005 and was substantially completed in August 2005. PDC had no involvement in the supervision or performance of that work.

In January 2005, the developer entered into a 10-year lease with NMC, which subsequently occupied the entire building.

This case arose and evolved in a procedurally convoluted posture that need not be recounted. It suffices to say that the litigation was precipitated by a letter to PDC from BOLI in March 2005 stating that BOLI had determined that the Tin Roof construction project was subject to the requirements of the prevailing wage rate statutes. Thereafter, the central—and ultimately dispositive—question, as framed by the parties' pleadings and evidentiary submissions, was whether the Tin Roof construction project was subject to the requirements of the Prevailing Wage Rate Law. As noted, on

cross-motions for summary judgment, the trial court answered that question in the negative, for several alternative and independently sufficient reasons.

■      On appeal, the parties substantially reiterate their arguments to the trial court. For the reasons that follow, we agree with the trial court that the Tin Roof construction project was not a "public work" within the meaning of *former* ORS 279.348(3), because PDC had not "contracted for" that project—and, thus, that project was not subject to the requirements of *former* ORS 279.350. Accordingly, we do not consider other, alternative, bases for affirmance.

The question is one of straightforward statutory construction. The Prevailing Wage Rate Law provides that "[t]he hourly rate of wage to be paid by any contractor or subcontractor to workers upon all *public works* shall be not less than the prevailing rate of wage for an hour's work in the same trade or occupation in the locality where such labor is performed." *Former* ORS 279.350(1) (emphasis added). *Former* ORS 279.348(3), in turn, defines "public works" as follows:

> " 'Public works' includes, but is not limited to, roads, highways, buildings, structures and improvements of all types, the construction, reconstruction, major renovation or painting of which is *carried on or **contracted for** by any public agency to serve the public interest but does not include the reconstruction or renovation of privately owned property which is leased by a public agency.*"

*Former* ORS 279.348(3) (emphasis and boldface added).

■      It is undisputed that the Tin Roof project qualifies as a "building" under the definition of "public works" and that PDC is a "public agency." Further, BOLI does not contend that PDC itself "carried on" the construction project. Thus, the inquiry reduces to whether PDC "contracted for" the "construction, reconstruction, [or] major renovation" of the Tin Roof property. In resolving that question, we apply the methodology prescribed in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993). We first consider the text and context of the statutory language and, if the legislature's intent is clear, our inquiry is complete. *Id*. at 611. If, however, ambiguity remains, we turn to the legislative history. *Id*. at 611-12.

We begin with the statutory text, on which the parties' competing constructions are predicated—somewhat remarkably—on the meaning of "for." BOLI argues that, in employing the term "contracted for," the legislature intended to encompass any circumstance in which "a contract between a public agency and another entity requires that entity to construct, or arrange for the construction of, the building or other improvement." Thus, BOLI reasons, the Prevailing Wage Rate Law applies, because PDC's ultimate goal in entering into the DDA was to have a building constructed at the Tin Roof site.

BOLI contends that "contracted" and "for" are words of common usage and that its construction of those terms comports with the " 'plain, natural and ordinary meaning.' " *See Haynes v. Tri-County Metro.*, 337 Or 659, 663, 103 P3d 101 (2004) ("words of common usage" should be given their plain, natural, and ordinary meaning). BOLI acknowledges that, although the dictionary includes numerous definitions of "for," only the following definition "makes any sense" in context: "with the purpose or object of." *See Webster's Third New Int'l Dictionary* 886 (unabridged ed 1993).

Reasoning from that definitional premise, BOLI contends that it is immaterial who will do the construction, who will own the building, or who will use the project once complete. Rather, so long as the ultimate goal of the agency's contract is to produce a building, even if the agency does not itself own or later use the building, the agency has "contracted for" the building, and the Prevailing Wage Rule Law applies.

PDC remonstrates that, as a matter of plain and practical understanding, the meaning of "contracted for" in *former* ORS 279.348(3) is much narrower than BOLI posits. PDC does not dispute that the definition of "for" BOLI espouses is, indeed, among the myriad definitions in *Webster's Third*. However, PDC contends that it is patently implausible. Rather, PDC suggests, the apposite definition of "for" is "because of" or "in order to obtain." *Webster's Third New Int'l Dictionary* 886 (unabridged ed 1993). From that definitional premise, PDC reasons that the "contracted for" language extends the prevailing wage requirements.only to

those projects in which the public agency is itself a party to the construction contract or the agency has committed, as of the time of the construction, to own or use the improved property. Thus, PDC asserts, the Prevailing Wage Rate Law does not apply to private development, even if that development is of property conveyed by a public entity and, ultimately, promotes the objectives of that entity.

█   PDC further contends that, as a contextual matter, the historical evolution of *former* ORS 279.348(3) corroborates that construction. The legislature inserted the term "contracted for" into the statutory definition of "public works" in 1989. Or Laws 1989, ch 752, § 1. Previously, that definition had encompassed only projects "carried on by any public agency." ORS 279.348(3) (1987). *See* Or Laws 1989, ch 752, § 1. In PDC's view, given that evolution,

> "[t]he surgical nature of the amendment suggests that its purpose was to clarify the definition, but not to alter its basic thrust. * * * By adding the phrase 'or contracted for,' the legislature clarified that a construction project is a public work regardless of whether the public agency conducts the construction project itself or contracts with a third party to perform that task on the public agency's behalf."

On balance, at *PGE*'s "first level," PDC's construction is more persuasive than BOLI's. Nevertheless, BOLI's construction remains plausible. As a linguistic and functional matter, it is at least possible that, in amending *former* ORS 279.348(3) in 1989, the legislature did intend to broaden the scope of the Prevailing Wage Rate Law in the manner BOLI urges. So long as a proposed interpretation is not "wholly implausible" in the face of the text and context, the statute remains ambiguous. *Owens v. MVD*, 319 Or 259, 268, 875 P2d 463 (1994); *State v. Stamper*, 197 Or App 413, 417, 106 P3d 172, *rev den*, 339 Or 230 (2005). Accordingly, we turn to the legislative history, which conclusively confirms PDC's construction.

That history shows that, in 1989, the legislature added the phrase "contracted for" to the definition of "public works" in specific response to the circumstances that we ultimately addressed in *Columbia-Pacific v. OPB*, 102 Or App 212, 794 P2d 438 (1990). In the mid-1980s, Oregon Public

Broadcasting (OPB) developed plans to build a new production facility but subsequently determined that it lacked the resources to immediately fund the construction of such a facility. Accordingly, OPB entered into an agreement with a private developer by which the developer (using private financing) agreed to build the new facility to OPB's specifications, and OPB agreed to lease the facility for up to 20 years, with an option to purchase after five years. *Id.* at 214-15. The developer began construction in 1987 and did not pay prevailing wage rates for the work performed. *Id.* In 1988, various labor organizations filed an action to compel BOLI to enforce the Prevailing Wage Rate Law against OPB; BOLI, in turn, filed a cross-complaint against OPB, alleging that the construction of the new facility was a "public work" within the meaning of *former* ORS 279.348(3). The trial court granted summary judgment for OPB, concluding that the project was not a "public work" under the then-extant statutory definition, which was limited to the "carried on by" formulation.

It was against that backdrop, as BOLI's (and the unions') appeal from the summary judgment was pending, that the legislature added the "contracted for" language to the statutory definition of "public works." BOLI, while continuing to maintain that the OPB project was, in fact, subject to the prevailing wage requirements,[2] proposed that the "contracted" language be added to ensure that the statute encompassed circumstances closely, functionally similar to those presented in the OPB case.

The testimony of BOLI's legal policy adviser before the House Committee on Labor, explaining the purpose of BOLI's proposal, is exemplary:

"The intent is to narrowly craft an amendment that would make sure that build-to-suit lease arrangements are covered under the law. It has been the Bureau's consistent position that the OPB project is covered under the law and

---

[2] We ultimately affirmed the trial court's allowance of summary judgment, agreeing that, in the totality of the circumstances, the construction of the new facility was not "carried on by" OPB. *See Columbia-Pacific*, 102 Or App at 219-20.

that I think is—explains why we believe that this amendment creates no new coverage but makes clear that build-to-suit arrangements like that involved in OPB are covered by the law. The amendment is not addressed specifically at any other intention. * * * That is the purpose of that second sentence to make clear that the policy thrust is whether or not the initiation and the reason for existence of the building was the promise to lease on the part of the public agency."

Tape Recording, House Committee on Labor, HB 2609, Apr 17, 1989, Tape 114, Side A (statement of Kelly Hagen). Colloquy among members of the committee further substantiates the focused purpose and limited scope of the proposed amendment. In particular, various legislators raised questions as to whether, under that amendment, the prevailing wage rate statute would apply when a public agency rented only part of the building or leased space for only a very limited period of time. Tape Recording, House Committee on Labor, HB 2609, Apr 17, 1989, Tape 114, Side A. There is no suggestion that the "contracted for" language was intended to encompass situations like that here, where the public agency was not a party to the construction contract, did not own the property at the time the work was undertaken, and made no subsequent use of the property.

The comments of Senator Shoemaker, who carried the bill on the Senate floor, also, and finally, corroborate the narrow scope of the proposed amendment:

"When a public agency contracts for the construction of a building, the spending power of the government is at work regardless of the form of the agreement. Ownership is not the critical issue. The issue is whether a project owes its existence to the financial commitment of a public agency. *That commitment may be in the form of a promise to purchase or a promise to lease, either way construction undertaken on the basis of such a commitment is precisely the circumstance in which the prevailing wage rate law is meant to apply.*"

Tape Recording, Senate Floor Debate, HB 2609, June 15, 1989, Tape 181, Side B (statement of Sen Robert Shoemaker) (emphasis added). Again, there was no suggestion of some broader purpose. In sum, the 1989 amendment was narrowly

tailored to ensure that the prevailing wage requirements applied to circumstances analogous to those presented in the OPB case. Nothing more.

Given the foregoing history, we agree with the trial court that PDC had not "contracted for" the Tin Roof construction project. Specifically, where, as here, a public agency merely sells land to a private entity to develop for its own private purpose, without continued participation akin to that presented in the OPB case, the agency has not "contracted for" the construction, even if the agency retains some control over the type or style of the development to ensure that the development is compatible with the agency's objectives. Accordingly, the trial court correctly allowed PDC's motion for summary judgment.

Affirmed.